UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

UNITED STATES OF AMERICA,
Plaintiff,

v. Case No. 8:22-cr-296-WFJ-UAM

STEPHEN SHERLOCK
Defendant.

______________________________

**SENTENCING MEMORANDUM**

COMES NOW the Defendant, STEPHEN SHERLOCK, by and through undersigned counsel and files this *Sentencing Memorandum* briefly stating:

Preliminary Statement

In the instant case, the Defendant has been adjudicated guilty on two of the three counts in the underlying (with the third count to be dismissed at sentencing). One count of conviction is for drug trafficking (actual methamphetamine/ICE) (Count Two), while the second count of conviction is for possession of firearm in furtherance of drug trafficking (Count Three). Individually, each count of conviction has a five-year minimum mandatory term of imprisonment, with the requirement that the term of imprisonment for the firearm charge run consecutive to any other sentence (*i.e.*, consecutive to the sentence that will be imposed for Count Two) . As more fully set forth herein, the U.S. Probation Office has calculated an "advisory guideline range"

of imprisonment consisting of 121 to 151 months at to the drug trafficking offense (Count Two)—followed by a consecutive five-year term of imprisonment for the firearm offense (Count Three). The Defendant, a perpetual drug addict with a zero "criminal history score" (Criminal History Category I), seeks a drug trafficking sentence of 60 months (the statutory required term), followed by the consecutive statutory term of an additional 60 months for the "firearm in furtherance" offense.

Background/Argument

In anticipation of the sentencing for Stephen Sherlock ("Mr. Sherlock) the U.S. Probation Office ("Probation") consulted the United States Sentencing Guidelines ("Guidelines"), and thereafter prepared a final Presentence Investigation Report ("PSR").[1] (*See* Doc. 74). As set forth in the PSR, the zero-criminal-history Mr. Sherlock will be 59 years of age at the time of sentencing. *Id*. at 3. "Life" for Mr. Sherlock began with his birth in Akron, Ohio. *Id*. at ¶40. His childhood consisted of minimal contact with his biological father—but the day-to-day living with a mother who drank and an alcoholic stepfather who would beat the adolescent Sherlock with belts, who "smacked [Sherlock] and his siblings around a lot," and who referenced the

[1] Mr. Sherlock, who had been advised by the undersigned regarding his forthcoming PSR interview, had nothing "to hide" from Probation during that interview; and therefore proceeded with the mutual understanding that Probation would not delve into the facts of the underlying alleged conduct. Probation abided by the forthgoing understanding.

then-young Sherlock boy as being a "retard." *Id*. at ¶¶40 and 42. Mr. Sherlock eventually ran away from home at age 16, at which time he took up residency with a companion twice his age. *Id*. at ¶43. It was just prior to running away from home that Mr. Sherlock began consuming alcohol daily (like his mother and stepfather);[2] consumption that he combined with the ongoing use of marijuana which had started at the age of 12.[3] Subsequent to running away, Mr. Sherlock also eventually started using cocaine. *Id*. at ¶65. Having relocated to from Akron, Ohio to New Port Richey, Florida in 2002,[4] the use of illicit drugs would continue throughout Mr. Sherlock's life and eventually go on to include the continued use of marijuana,[5] the daily use of methamphetamine (from 2003-2005 and 2018 until the of his arrest in September 2022),[6] and the back-and-forth use of cocaine.[7] Healthwise, Mr. Sherlock reports that he: (a) has suffered three heart attacks,[8] (b) has ongoing issues with a tumor under his right armpit,[9] (c) has been experiencing

[2] (Doc. 74 at ¶63).

[3] (Doc. 74 at ¶64).

[4] (Doc. 74 at ¶41).

[5] (Doc. 74 at ¶64).

[6] (Doc. 74 at ¶66).

[7] (Doc. 74 at ¶65).

[8] (Doc. 74 at ¶54).

[9] (Doc. 74 at ¶56).

urination issues since last year,[10] (d) has poor eyesight (needs reading glasses),[11] and (e) has a need for oral surgery to extract some teeth.[12] According to Mr. Sherlock, in third grade he was diagnosed with attention deficit hyperactivity disorder.[13] Mr. Sherlock has reported that during the period of 1980 through 2009 he made three attempts at suicide by overdosing on pills. *Id.* at ¶60.

For the three-year period leading up to the underlying arrest, Mr. Sherlock was self-employed and was conducting home renovations as well as selling t-shirts online.[14] Mr. Sherlock also has previous employment experience as an assistant in an air conditioning business,[15] and nearly two decades employment in the landscaping and irrigation business.[16]

---

[10] (Doc. 74 at ¶57). Probation indicates that according to a *Mobile Ultrasound Services* medical report (completed on April 6, 2023), Mr. Sherlock "has some heterogeneity of echogenicity of the prostate gland with calcifications though to be present." (Doc. 74 at ¶59).

[11] (Doc. 74 at ¶58).

[12] (Doc. 74 at ¶58). Jail records indicate that Mr. Sherlock "has dental problems and needs a tooth extracted." *Id.* at ¶59.

[13] (Doc. 74 at ¶61).

[14] (Doc. 74 at ¶73).

[15] (Doc. 74 at ¶74).

[16] (Doc. 74 at ¶¶75-6).

With regards to the issues of criminal conduct and culpability, the evidence in this case shows that Mr. Sherlock was a drug addict (with a substantial consumption of methamphetamine) who supported his habit by "re-upping" with a supplier who knew of his serious addiction and took advantage of Mr. Sherlock's addiction to engage in that person's own conduct (including what appears to be having packages shipped to Mr. Sherlock's home). Generally, law enforcement was able to intercept two packages of methamphetamine destined for Mr. Sherlock's residence,[17] which eventually influenced the obtaining of a search warrant that yielded a comparatively small amount of methamphetamine (26.96 grams) and cocaine (.422 grams) from within Mr. Sherlock's residence.[18] It appears that Mr. Sherlock's role in the in this drug conspiracy case was that of a minor participant when compared to that of the person(s) who took advantage of his addiction.[19]

It is without dispute that Mr. Sherlock's criminal history is zero, and he is therefore a criminal history category I.[20] As to the instant offense, Probation determined that Mr. Sherlock should be held accountable for

[17] (Doc. 74 at ¶¶12-3) (one package contained 974.6 grams of actual methamphetamine/ICE, while a second package contained 223.7 grams of actual methamphetamine/ICE).

[18] (Doc. 74 at ¶14).

[19] (Doc. 74 at ¶64). Mr. Sherlock seeks a two level downward adjustment for his role as a "minor participant. *See* USSG §3B1.2(b).

[20] (Doc. 74 at ¶34).

1,225.26 grams of methamphetamine, which includes law enforcement's interception of the aforementioned two packages of methamphetamine destined for the Sherlock residence,[21] and the location of the comparatively small amount of methamphetamine and cocaine located during the search of the residence.[22] From the standpoint of an advisory guideline range, Probation calculated that Mr. Sherlock's drug trafficking offense has a **Base Offense Level** of 34, reduced by two levels for acceptance of responsibility (bringing his **Total Offense Level** to 32), and a resulting drug trafficking offense advisory guideline range of 121 to 151 months.[23] Probation also

---

[21] (Doc. 74 at ¶¶12-3).

[22] (Doc. 74 at ¶14).

[23] (Doc. 74 at ¶85). Recognizing that two different controlled substance are involved (i.e., actual/methamphetamine/ICE and cocaine) and are therefore combined to reach a "converted drug weight," Mr. Sherlock notes here that Probation's advisory guidelines calculation includes a converted weight analysis of the actual/methamphetamine/ICE at a 20:1 ratio. For policy reasons Mr. Sherlock states that this Honorable Court should use the 10:1 ratio for actual/methamphetamine/ICE that other courts in the Middle District have applied—although applying a 10:1 ratio (resulting converted drug weight of 12,252.68 kilograms), as opposed to a 20:1 ratio (24,505.28 kilograms) won't make a difference here because the converted weight of both rendered a Base Offense Level of 34.

Nevertheless, Mr. Sherlock must point out that sentencing courts can consider arguments that the applicable guidelines fail properly to reflect § 3553(a) considerations, reflect an unsound judgment, do not treat defendant characteristics in the proper way, or that a different sentence is appropriate regardless. *See Rita v. United States*, 551 U.S. 338, 35 (207). Judges "may vary [from Guidelines ranges] based solely on policy considerations, including disagreements with the Guidelines." *Kimbrough v. United States*, 552 U.S. 85, 101 (207) (internal quotation marks and citations omitted). Whether a judge may draw any useful advice from a guideline depends first on whether the Commission, in promulgating or amending it, acted in "the exercise of its characteristic institutional role." *Kimbrough*, 552 U.S. at 109. As described in *Rita*, the exercise of this role has two basic components: (1) reliance on

empirical evidence of pre-guidelines sentencing practice, and (2) review and revision in light of judicial decisions, sentencing data, and consultation with participants in and experts on the criminal justice system. *Rita*, 551 U.S. at 348-50. Where a guideline was not developed based on this "empirical data and national experience," it is not an abuse of discretion to conclude that it "yields a sentence 'greater than necessary' to achieve § 3553(a)'s purposes, even in a mine-run case." *Kimbrough*, 552 U.S. at 109-10 (emphasis added). *See also Spears v. United States*, 129 S. Ct. 840, 843-44 (2009) ("we now clarify that district courts are entitled to reject and vary categorically from the crack-cocaine Guidelines based on a policy disagreement with those Guidelines."). Disagreement with a guideline that does "not exemplify the Commission's exercise of its characteristic institutional role" is entitled to as much appellate "respect" as a fact-based departure or variance. *See Spears*, 129 S. Ct. at 843; *Kimbrough*, 552 U.S. at 109-10.

Many district courts have come to recognize that the guideline for actual methamphetamine ("ice") produces inequitable results. *See Untied States v. Bean*, No. 18-cr-057-03 No. 2019 WL 1003338, *3 (D. N.H. March 1, 2019) (the methamphetamine guidelines create unwarranted sentencing disparities between methamphetamine offenses and offense involving other major drugs); *United States v. Pereda*, No. 18-cr-228, 2019 WL 463027, *4 (D. Colo. Feb. 6, 2019) (concluding that the 10:1 ratio "creates Guideline ranges for actual (and ice) methamphetamine that are excessive and not similar to the other Guidelines"); *United States v. Hoover*, No. 4:17-cr-327, 2018 WL 5924500, *3 (D. Idaho Nov. 13, 2018) ("Purity is also a less meaningful proxy for culpability where nearly all methamphetamine sold is of 90 percent purity or greater."); *United States v. Ferguson*, No. 17-204, 2018 WL 3682509, *4 (d. Minn. Aug. 2, 2018) (finding that the 10:1 ratio "creates a substantial risk of unwarranted sentencing disparity"); *United States v. Harry*, 313 F.Supp.3d 969, 974 (N.D. Iowa 2018) ("I find both (a) drug purity is not an accurate proxy for culpability in light of the fact that nearly all of the methamphetamine cases brought in our district involve high-purity methamphetamine and (b) the 10-to-1 ratio established in the Guidelines is not based on empirical evidence."); *United States v. Saldana*, No. 1:17-cr-271-1, 2018 U.S. Dist. LEXIS 110790, *12 (W.D. Mich. July 3, 2018) ("it is . . . an inescapable conclusion that the current methamphetamine guidelines fail to achieve that mandate . . . [of imposing sentences that "are sufficient but not greater than necessary to achieve the goals of just punishment"]).

Finally, although not noted in the underlying PSR for Mr. Sherlock, undersigned counsel notes that the Probation Office in the Orlando Division has on at least two occasions in which the undersigned has been counsel of record noted the following:

> **Part F. Factors That May Warrant A Sentence Outside of the Advisory Guideline System**: "Pursuant to the Sentencing Guidelines having a 10 to 1 ratio in cases dealing with a mixture of methamphetamine and methamphetamine (actual)/ICE, the Court may also consider varying below the advisory guideline system. In this case, the 542.42 grams of

correctly points out that statutorily there is a five year minimum mandatory sentence for the drug trafficking offense,[24] which must be followed by a mandatory consecutive five year term of imprisonment for the firearm offense.[25] These convictions do not require that Mr. Sherlock be deemed ineligible for federal benefits; therefore, Mr. Sherlock is requesting that the Court not order the denial of federal benefits. (See Doc. 74 at ¶¶98-9).

Financially, in 2021 Mr. Sherlock filed for bankruptcy.[26] Mr. Sherlock does not on any real estate,[27] nor does it appear that he has any banking accounts.[28] Probation indicates that the total assets of Mr. Sherlock equate to less than $10,000,[29] with his liabilities exceeding that amount.[30] As noted by

---

> methamphetamine and the 0.182 grams of cocaine base would then result in a converted drug weight of 1,085.49 kilograms [instead of 10,849.05 kilograms]."

*See United States v. Crespo*, Case No. 6:22-cr-163-RBD-DCI (M.D. Fla., April 17, 2023), at Doc. 56.

[24] (Doc. 74 at ¶¶83).

[25] (Doc. 74 at ¶¶83-5).

[26] (Doc. 74 at ¶78). The bankruptcy was discharged. *Id.*

[27] (Doc. 74 at ¶79).

[28] (Doc. 74 at ¶80).

[29] (Doc. 74 at ¶80).

[30] (Doc. 74 at ¶80).

Probation, Mr. Sherlock does not appear to have the ability to pay a fine within the guideline range.[31]

The probation office has identified Mr. Sherlock's abuse of illicit substances (which led to the involvement in the underlying offense) to support his substance abuse problems, physical abuse during Mr. Sherlock's formative years, and witnessing substance abuse by his parents during his formative years. (*See* Doc. 74 at ¶102). Considering the history and characteristics of Mr. Sherlock, including, *inter alia*, his age, his lack of a significant criminal history during the 59 years of his life, his mental health history, his substance abuse history, and his childhood abuse there are 18 U.S.C. §3553(a) factors that suggest that an advisory guideline sentence of sixty (60) months as to Count Two, followed by a consecutive sixty (60) months as to Count Three is a sufficient but not greater than necessary sentence to achieve the purposes of sentencing.[32] Of course, the foregoing sentencing recommendation is made without the Government having filed a motion that would eliminate any applicable minimum mandatory sentence.

---

[31] (Doc. 74 at ¶82).

[32] Letters of support from Mr. Sherlock's sisters are attached hereto. See Exhibits A & B, respectively.

Bureau of Prison Recommendations

Mr. Sherlock is asking that this Honorable Court to make the following recommendation to the Bureau of Prisons with regards to place of incarceration and prison programs:

(a) Incarceration at Jessup;

(b) Enrollment/participation in First Step Act's Evidence Based Recidivism Reduction Programs and Productive Activities;

(c) RDAP Program;

(d) College course programs; and

(e) Vocational training in: HVAC, Welding, and Direct to Garment Printing.

Respectfully submitted this 20th day of September, 2023.

**IRVIN LAW FIRM**

*/s/ Grady C. Irvin, Jr.*

Grady C. Irvin, Jr. (FBN: 6548)
507 W. Dr. M.L. King, Jr. Blvd. *(street)*
P.O. Box 4587 *(mailing)*
Plant City, Florida 33563
Telephone: 813.659.2000
grady@irvinattorneys.com

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 20th day of September, 2023, a true and correct copy of the foregoing was provided by electronic (CM/ECF) filing to:

**AUSA Samantha E. Beckman**

**IRVIN LAW FIRM**

*/s/ Grady C. Irvin, Jr.*

______________________________

Grady C. Irvin, Jr. (FBN: 6548)
507 W. Dr. M.L. King, Jr. Blvd. *(street)*
P.O. Box 4587 *(mailing)*
Plant City, Florida 33563
Telephone: 813.659.2000
grady@irvinattorneys.com